

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JAMES ALFRED CROWDER and | § | |
| SHIRLEY ANN CROWDER | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| | § | |
| VS. | § | |
| | § | |
| GENERAL ELECTRIC COMPANY, ET AL. | § | |
| Defendants. | | |

## GENERAL ELECTRIC COMPANY'S NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendant General Electric Company

("GE"), gives notice of removal of an action filed against it in the Supreme Court of the State of

New York, County of New York, to the United States District Court for the Southern District of New

York. In support, GE respectfully offers the following:

### Preliminary Matters

1.    On, or about, April 23, 2008, plaintiffs filed this lawsuit, entitled James Alfred

Crowder and Shirley Ann Crowder, Index No. 08-105768 against GE and numerous other defendants

in the Supreme Court of the State of New York, County of New York. *See* Summons and Complaint

attached hereto as Exhibit A.

2.    Plaintiffs served GE with Plaintiffs' Summons and Complaint on, or about, April 24,

2008. The Complaint did not state plaintiffs' claims in a manner or in sufficient detail to inform GE

that the case was removable. *See Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 698 (S.D. Tex.

2002) (stating that if the initial pleading does not provide details of plaintiff's claims, the 30-day time period begins on the date defendant receives "other paper" specifically indicating grounds for removal). Plaintiffs' counsel forwarded a copy of Plaintiffs' Answers to Defendants' Fourth Amended Standard Set Of Interrogatories ("Discovery Responses") on April 25, 2008. *See* Discovery Responses attached hereto as Exhibit B. Plaintiffs Responses include allegations that plaintiff was exposed to asbestos while serving in the United States Navy ("Navy") and working on a Navy Ship. *Id.* at Chart A. Specifically, there are allegations of exposure while working as a Fireman and Boiler Tender on the USS FDR between 1958 and 1962. *Id.*

3.    Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by GE of "other paper" from which it ascertained that this case is removable. 28 U.S.C. § 1446(b).

## Nature Of The Case

4.    The case is based on plaintiffs' allegations that James Alfred Crowder's asbestos-related disease, specifically mesothelioma, was caused by his exposure to asbestos dust and/or fibers.

5.    Plaintiffs assert failure to warn claims against GE along with strict liability and negligence claims against the other defendants based on various theories.

## Grounds For Removal

6.    This Notice of Removal is filed within thirty (30) days of GE's receipt of Plaintiffs' Responses to Defendants' Fourth Amended Standard Set of Interrogatories, which constitutes "other paper". 28 U.S.C. § 1446(b). GE manufactured marine steam turbines for use on Navy ships pursuant to contracts and specifications executed by the U.S. Navy. GE has confirmed that its marine steam turbines were on the USS FDR. The basis for removal is that, in the manufacture and sale of turbines and other equipment for the U.S. Navy, including all aspects of warnings associated

with those turbines and equipment, GE was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.      Should plaintiffs file a motion to remand this case, GE respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

8.      As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), GE has a federal defense to this action, *i.e.*, government contractor immunity from liability for injuries arising from any exposure to asbestos related to turbines on board U.S. Navy vessels, insofar as they were constructed or repaired by GE.  Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

9.      One New York Federal Court has reviewed this issue as recently as February 2004. In *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court. Defendants removed to federal court asserting, among other things, federal jurisdiction under the All Writs Act. *Id.* at 445. The New Jersey District Court found removal appropriate under the All Writs Act. *Id.* The case was then transferred to the Eastern District of New York by the Multidistrict Panel. *Id.* The Court of Appeals for the Second Circuit affirmed the district court's denial of remand finding jurisdiction appropriate under the All Writs Act. *Stephenson v. Dow Chemical Company*, 273 F.3d 19 (2d Cir. 2003). On review, the United States Supreme Court remanded the case finding that the All Writs Act alone would not support removal. *Dow Chemical Company v. Stephenson*, 539 U.S. 111 (2003). On

remand from the Supreme Court, the Second Circuit determined that jurisdiction could not be grounded in the All Writs Act and remanded the case back to the Eastern District of New York to determine if there was an alternative ground supporting federal jurisdiction. *Stephenson v. Dow Chemical Company*, 346 F.3d 19 (2d Cir. 2003). It is with that extensive procedural history that the district court examined the federal officer removal statute and found it sufficient to deny plaintiff's motion to remand. *Isaacson,* 304 F.Supp. at 445.

10.    In reaching its conclusion, the *Isaacson* court discussed in detail the three elements necessary for removal under this statute. First, a defendant must demonstrate that it is a "person" within the meaning of the statute. *Id.* at 446. The definition of a "person" includes a corporation. *Id.* Second, the defendant must establish that the suit is "for any act under color of federal office," i.e., there is a causal connection between the charged conduct and asserted official authority. *Id.* (citations omitted). Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office. *Id.* Third, defendants must raise a colorable claim to a federal law defense. *Id.* As previously stated, a colorable claim to a federal defense can be predicated upon the federal government contractor defense. *Id.* at 449.

11.    The second element requires a causal nexus between the defendant's actions under the federal officer and plaintiff's state court claims. *Id.* at 447. A substantial degree of direct and detailed federal control over defendant's work is required. *Id.* What constitutes sufficient federal control is often central to a court's decision to uphold removal or remand a case. Several courts have upheld removal because defendants were sued as a result of building products pursuant to military specifications. *See Crocker v. Borden*, 852 F.Supp. 1322 (E.D.La. 1994)(holding that removal was

proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications); *see also, Pack v. AC and S, Inc.*, 838 F.Supp. 1099 (D.Md. 1993)(holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth). Not all courts agree, however, on the amount of federal control necessary to uphold removal under this statute.

12.    New York courts have not always viewed this issue consistently.  Prior to the *Isaacson* case, the Eastern District Court remanded a similar matter involving Agent Orange.  In *Ryan v. Dow Chemical Company*, 781 F.Supp. 934, 950 (E.D.N.Y. 1992), the district court remanded the case because it found that the control by the government was not sufficient to meet the requirements of section 1442(a)(1).  The district court reasoned that the government sought only to buy a ready-to-order herbicide from the defendant and did not cause or control the production of the unwanted byproduct, dioxin, which was the alleged cause of the injuries.  *Id.*

13.    In discussing *Ryan*, the *Isaacson* court acknowledged that it was a contradictory decision. *Isaacson*, 304 F.Supp. at 445.  It declared, however, that the *Ryan* decision was "no longer persuasive" and went on to discuss Fifth Circuit cases that specifically rejected the *Ryan* conclusion.  *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 392 (5th Cir. 1998)(holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute); *see also, Miller v. Dow Chemical Company*, 275 F.3d 414, 417 (5th Cir. 2001)(also holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute).  The *Isaacson* court denied remand based on facts that were almost identical to those in *Ryan*.  The *Isaacson* court concluded that the government ordered specifications differed from the specifications for the defendants' commercial application of the product. *Isaacson, supra* at 450.  In

5

addition, the method of warning and application was completely in the government's hands. *Id.* Finally, the government had full knowledge of the dioxin "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated the control with which the government operated and, thus, warranted a different holding than *Ryan. Id.*

14.    This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning." *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S. 919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government. *Kerstetter,* 210 F.3d at 438.

15.    As stressed in *Kerstetter,* "[t]he government need not prepare the specifications to be considered to have approved them." *Id.* at 435. The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. *Id.* While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "'continuous back and forth' between the contractor and the government." *Id.* In this regard, "[t]he specifications need not address the specific defect alleged; the government need only evaluate the design feature in question." *Id.* Once again, applying these general principles to "failure to warn" claims, the fact that governmental specifications or regulations

did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is not an issue when it is the government's warning in the first place." *Id.* at 438.

16.    The present case is substantially similar to *Kerstetter, supra.*  As explained by Hobson:

> [T]he Navy exercised intense direction and control over all written documentation and any safety or caution information that the navy, in its sole discretion, directed be provided with these [GE] turbines.
>
> The U.S. Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by GE to the Navy. GE would not have been permitted, under the specifications, associated regulations and procedures, and especially under the actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a naval vessel, beyond those required by the Navy.
>
> [T]he U.S. Navy had precise specifications, practices and procedures as to the nature of written materials to be delivered with its naval turbines, such as engineering drawings, test reports, and other technical data that could be used as needed by shipboard engineering officers during the life of the equipment. Some of the material was typically compiled into a volume that was generically called a "technical manual." The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval turbines only to the extent directed by the Navy.
>
> [T]he Navy, not GE, determined the nature of warnings communicated to naval personnel in relation to shipboard equipment and materials.

*See* Exhibit C at ¶¶ 2-6. Thus, the presence or absence of warnings regarding GE equipment was strictly controlled by the Navy - and a clear basis for removal exists under § 1442(a)(1).

17.    In further support of the removal, GE provides the Affidavit of Admiral Ben J. Lehman, U.S. Navy, Ret. *See* Affidavit of Admiral Lehman attached hereto as Exhibit D. Admiral Lehman joined the Navy in 1942 and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1054. *Id.* at ¶ 1. He also worked as an engineer at GE between 1946 and 1948. *Id.* During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment over hauls at the Brooklyn Navy Yard. *Id.* at ¶ 3. Admiral Lehman states in his Affidavit the Navy controlled every aspect of the design and manufacture of equipment intended for installation on Navy vessels and that the Navy could not, and did not, permit its contractors to implement changes from military specifications. *Id.* at ¶¶ 2 and 3. He further states that in the 1940s and afterward, the navy had complete control over every aspect of each piece of equipment including instructions, warnings, drawings, nameplates, texts of instruction manuals and "every other document relating to the construction, maintenance and operation" of equipment of its vessels. *Id.* at ¶ 4. These facts have recently been held sufficient to support removal in a similar case. *See Nesbiet v. General Electric Company, et al.*, 04 CV 9321 (S.D.N.Y March 28, 2005) attached hereto as Exhibit F. Clearly, the Hobson and Lehman Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to GE's actions has been established.

18.    A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The federal

officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v. Morgan*, 395 U.S. 402, 405 (1960).

19.    GE is not required to notify and obtain the consent of any other defendant in this action in order to remove Plaintiffs' action as a whole under § 1442(a)(1). *See Torres v. CBS News*, 854 F.Supp. 245 (S.D.N.Y. 1994)

20.    As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon GE are being filed with this Notice of Removal. Please note, however, that no Orders have been entered to date.

### Conclusion

21.    Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(1) because GE was acting under an officer or agency of the United States.

THEREFORE, General Electric Company, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the Supreme Court of the State of New York, County of New York, on this 22nd day of May, 2008.

Respectfully submitted,

By: _____
Michael A. Tanenbaum
**SEDGWICK, DETERT, MORAN & ARNOLD LLP**
Three Gateway Center, 12th Floor
Newark, New Jersey 07102
(973) 242-0002
**ATTORNEYS FOR DEFENDANT**
**GENERAL ELECTRIC COMPANY**

**cc: Via Hand Delivery**

Jerome H. Block, Esq.
LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
(212) 605-6200
ATTORNEYS FOR PLAINTIFFS

All Known Defense Counsel (via regular mail)

5/2/08
#10010767

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JAMES ALFRED CROWDER and SHIRLEY ANN CROWDER,

                              Plaintiffs,

             - against-

A.W. CHESTERTON CO., INC.;
AMERICAN REFRACTORIES CO.;
CARRIER CORPORATION
        f/k/a Bryant Manufacturing Corporation;
CBS CORPORATION,
        f/k/a Viacom Inc., successor by merger
        to CBSCorporation, f/k/a Westinghouse
        Electric Corporation;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.,
        a/k/a Deming Pumps Division of Crane Co.;
DURABLA MANUFACTURING COMPANY;
FOSTER WHEELER ENERGY CORP.;
GARLOCK SEALING TECHNOLOGIES, LLC,
        successor by merger to GARLOCK, INC.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES CO.;
GOULDS PUMPS INCORPORATED;
HERCULES CHEMICAL COMPANY, INC.;
HOWDEN BUFFALO INC.,
        individually and as success-in-interest
        to B.F. Sturtevant;
IMO INDUSTRIES, INC.,
        as successor to and f/k/a Delaval Turbine,
        Transamerica Delaval and IMO Delaval;
INGERSOLL-RAND COMPANY;
J.H. FRANCE REFRACTORIES COMPANY;
LESLIE CONTROLS, INC.,
        f/k/a Leslie Company;
RAPID-AMERICAN CORPORATION,
        as successor-in-interest to Phillip Carey
        Manufacturing Corp.;
UNION CARBIDE CORP.;
VOLKSWAGEN OF AMERICA, INC.;
WARREN PUMPS, INC.;

DOF: 4/23/08
Index No.: 08/105768

**SUMMONS**

Plaintiff designates
NEW YORK COUNTY
as place of for trial

The basis for venue is
Defendant's place of business

Plaintiffs reside at
10 Blackfoot Court
Lafayette, IN 47909

NEW YORK
COUNTY CLERKS OFFICE

APR 23 2008

NOT COMPARED
WITH COPY FILE

00115442.WPD

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

YARWAY CORPORATION;
YORK INDUSTRIES, INC.;

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**TO THE ABOVE NAMED DEFENDANTS:**

**You are hereby summoned** to answer in this action and to serve a copy of your answer,

or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plain-

tiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service

(or within 30 days after the service is complete is this summons is not personally delivered to you

within the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       April 23, 2008

                        Yours, etc.,

                        LEVY PHILLIPS & KONIGSBERG, LLP
                        *Attorneys for Plaintiffs*


                        By: Jerome H. Block

                        800 Third Avenue, 13th Floor
                        New York, N.Y. 10022
                        (212) 605-6205


Defendants Address:
SEE ATTACHED LIST

00115442.WPD

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JAMES ALFRED CROWDER and SHIRLEY ANN CROWDER,

|  |  |
|---|---|
| Plaintiffs, | DOF: 4/23/08 |
|  | Index No.: 08/105768 |

- against-

**COMPLAINT**

A.W. CHESTERTON CO., INC.;
AMERICAN REFRACTORIES CO.;
CARRIER CORPORATION
    f/k/a Bryant Manufacturing Corporation;
CBS CORPORATION,
    f/k/a Viacom Inc., successor by merger
    to CBSCorporation, f/k/a Westinghouse Electric Corporation;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.,
    a/k/a Deming Pumps Division of Crane Co.;
DURABLA MANUFACTURING COMPANY;
FOSTER WHEELER ENERGY CORP.;
GARLOCK SEALING TECHNOLOGIES, LLC,
    successor by merger to GARLOCK, INC.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES CO.;
GOULDS PUMPS INCORPORATED;
HERCULES CHEMICAL COMPANY, INC.;
HOWDEN BUFFALO INC.,
    individually and as success-in-interest
    to B.F. Sturtevant;
IMO INDUSTRIES, INC.,
    as successor to and f/k/a Delaval Turbine,
    Transamerica Delaval and IMO Delaval;
INGERSOLL-RAND COMPANY;
J.H. FRANCE REFRACTORIES COMPANY;
LESLIE CONTROLS, INC.,
    f/k/a Leslie Company;
RAPID-AMERICAN CORPORATION,
    as successor-in-interest to Phillip Carey
    Manufacturing Corp.;
UNION CARBIDE CORP.;
VOLKSWAGEN OF AMERICA, INC.;
WARREN PUMPS, INC.;

00115430.WPD

YARWAY CORPORATION;
YORK INDUSTRIES, INC.;

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**TO THE ABOVE NAMED DEFENDANTS:**

        Plaintiffs, by their attorneys, LEVY PHILLIPS & KONIGSBERG, LLP, for their Complaint,

respectfully allege as follows:

        1.      Plaintiffs repeat and re-allege New York Asbestos Litigation Standard Complaint

No. 1 as if fully incorporated herein.

        2.      Plaintiffs are citizens of the State of Indiana.

        3.      Plaintiff, JAMES CROWDER, has been diagnosed with Mesothelioma and meets the

minimum requirement for activation into the active docket pursuant to the Case Management Order

governing these actions.

Dated: New York, New York
        April 23, 2008


                                        LEVY PHILLIPS & KONIGSBERG, LLP
                                        *Attorneys for Plaintiffs*


                                        By:_____
                                                Jerome H. Block

                                        800 Third Avenue
                                        New York, N.Y. 10022
                                        (212) 605-6205


00115437.WPD

MORTON PLANT HOSPITAL
**Department of Pathology**

Haider Asad, M.D.    George D. Schaefer, M.D.    Kenneth R. Schroer, M.D.    Antonela Zanchi, M.D.

Diplomates of American Board of Pathology
300 Pinellas Street
Clearwater, Florida 33756
Phone: 727-462-7062  Fax: 727-462-7617

Name: **CROWDER, JAMES A**                    Requested By: PRUITT, J CRAYTON

## SURGICAL PATHOLOGY REPORT

PS-07-0017402                                    Collected: 11/29/2007
                                                 Received: 11/29/2007 12:53:00
                                                 PM

### FINAL DIAGNOSIS

A. BIOPSY, LEFT CHEST WALL NODULE:
   HYALINIZED FIBROUS TISSUE WITH ATYPICAL MESOTHELIAL
   PROLIFERATION.
B. BIOPSY, DIAPHRAGM NODULE:
   MALIGNANT MESOTHELIOMA.
C. BIOPSY, LEFT CHEST WALL:
   MALIGNANT MESOTHELIOMA.

AJCC Stage: pTXNXMX

Reviewed, Approved, and Electronically Signed by: HAIDER ASAD, M.D.
Verified: 12/04/2007 10:55 am
HA /bjt

### COMMENT

Pleural mesothelioma staging form attached.

### INTRAOPERATIVE CONSULTATION

FSA: BENIGN by ha.

### GROSS DESCRIPTION

Received are three specimens.  Specimen A consists of multiple portions of firm gray-white to yellow-gray soft tissue measuring 0.4 to 1 cm in greatest dimension.  The tissue is entirely submitted for frozen section.

Specimen B consists of multiple portions of yellow-gray to red-tan soft tissue measuring from 0.1 to 1.3 cm.  Entirely submitted.

Specimen C consists of multiple portions of gray-white to red-gray soft tissue measuring 2.2 x 1.5 x 0.4 cm in aggregate.

| Acct.: 00000091405790 | MRN: 00000981478323 | Location: MP BAR6/684 |
|---|---|---|
| | | Discharged: 12/1/2007 |
| DOB/Sex: 7/5/1941/Male | Adm. Phys: LEWIS, CHARMAINE A | Morton Plant Hospital |
| | | 300 PINELLAS ST |
| | | CLEARWATER  FL  33756 |
| CC: | | Name: **CROWDER, JAMES A** |

Name: CROWDER, JAMES A                          Requested By: PRUITT, J CRAYTON

## SURGICAL PATHOLOGY REPORT

PS-07-0017402                                              Collected: 11/29/2007
                                                           Received: 11/29/2007 12:53:00
                                                           PM

Entirely submitted.

RJH/bjt 11/29/07 03:31 pm

### MICROSCOPIC DESCRIPTION

Clinical information is noted (left pleural effusion).

A. Sections show hyalinized fibrous tissue with calcification and atypical mesothelial proliferation

B. Sections show malignant mesothelioma Immunoperoxidase stains (TAG72, BEREP4, D2-40, CEA,P53, TTF-1, calretinin and WT-1) support morphologic impressions.

C. Sections show malignant mesothelioma. Immunoperoxidase stains (CK-7, CK-20, TTF-1, calretinin and WT-1) support morphologic impressions.

| Acct. : 00000091405790 | MRN: 00000981478323 | Location: MP BAR6/684 |
| | | Discharged: 12/1/2007 |
| DOB/Sex: 7/5/1941/Male | Adm. Phys: LEWIS, CHARMAINE A | Morton Plant Hospital |
| | | 300 PINELLAS ST |
| | | CLEARWATER  FL  33756 |
| CC | | Name: CROWDER, JAMES A |



SUPREME COURT OF THE STATE OF NEW YORK
ALL COUNTIES WITHIN NEW YORK CITY
-------------------------------------------------------X

In Re:          NEW YORK CITY                          NYCAL
                ASBESTOS LITIGATION
-------------------------------------------------------X

This Document Applies to:                              **PLAINTIFF'S    ANSWERS    TO
                                                       DEFENDANTS'    FOURTH
                                                       AMENDED STANDARD SET OF
**JAMES CROWDER**          **Index No.: 08/105768**    **INTERROGATORIES    AND
                                                       REQUEST  FOR  PRODUCTION
                                                       OF DOCUMENTS**

-------------------------------------------------------X

00115458.WPD

## **GENERAL OBJECTION**

Plaintiff objects to these discovery requests to the extent they seek information protected as attorney-client privilege and/or work product doctrine.  Finally, plaintiff objects to any discovery request that may be construed as requesting production of Proof of Claim Forms (POCs) and/or other documents reflecting communications between plaintiff and any settlement trust or any other entity made solely for purposes of settlement. See CPLR § 4547.

00115458.WPD

2

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

## **INTERROGATORIES**

1.    State the following:

      (a)    your full name, and all other names by which you have been known;

      (b)    age, and date and place of birth;

      (c)    whether you were an adopted child;

      (d)    present marital status, date of current marriage, spouse's maiden name, dates of any prior marriages and the names of any prior spouses, if applicable;

      (e)    present home address; and

      (f)    social security number.


A.1.    (a)    James Crowder, (Jim).

      (b)    66; July 5, 1941; Williamsport, IN.

      (c)    Natural.

      (d)    Married; September 15, 1962; Shirley Knowles.

      (e)    10 Barefoot Court, Lafayette, IN.

      (f)    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.


2.    State the following with regard to your father and mother:

      (a)    names;

      (b)    current address (if deceased, state last known address);

      (c)    the current condition of each one's health, including any specific medical

00115458.WPD                                3

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

problems. If either of your parents are deceased, please state for each deceased parent:

        I.      specific physical problems;

        ii.     date and place of death;

        iii.    age and cause of death for each parent.

A.2.  (a)    Mother: Dorothy Beaver     Father: Fred Crowder.

      (b)    Mother: deceased, Monroe St, Williamsport, IN.

            Father: deceased, Monroe St, Williamsport, IN.

      (c)    Mother: deceased, Monroe St, Williamsport, IN.

            Father: deceased, Monroe St, Williamsport, IN.

      (I)    Mother: Unknown      Father: Unknown

          (ii)    Mother: approximately early 1980's; Monroe St, Williamsport, IN.

                Father: 3/8/1974; Monroe St, Williamsport, IN.

          (iii)   Mother: Parkinson disease

                Father: Prostate cancer.

3.    State the following with regard to each of your children:

    (a)    full name;

    (b)    the date of birth;

    (c)    sex;

    (d)    current address (if deceased, state the last known address);

    (e)    social security number;

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(f)    whether birth child or adopted child;

(g)    current state of each one's health.  If any of your children are deceased,

state for each deceased child:

I.    specific physical problems;

ii.    date and place of death; and

iii.    age and cause of death for each child.


A.3.I.    (a)    Michelle Lathrop.

(b)    December 8, 1964.

(c)    Female.

(d)    3227 Hyde Park Dr., Clearwater, FL.

(e)    To be provided.

(f)    Birth.

(g)    Good.


A.3.II.    (a)    Michael Crowder.

(b)    February 28, 2008.

(c)    Male.

(d)    6925 New Castle Road, Lafayette, IN.

(e)    To be provided.

(f)    Birth.

(g)    Good.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

A.3III.     (a)     Mark Crowder.

          (b)     March 23, 1968.

          (c)     Male.

          (d)     Not applicable.

          (e)     Not applicable.

          (f)     Birth.

          (g)     Deceased, (died in house fire at 15yrs old).

4.     State the complete address of all places you have resided since birth giving the inclusive dates of residence for each place named and as to each state:

          (a)     fuel use for heating and cooking;

          (b)     significant home improvements (e.g., additions, reinsulation, re-wiring, etc.);

          (c)     number of family units co-occupying said structure.

A.4.I.     304 Monroe St., Williamsport, IN.

       Approximately 1944 to 1961.

          (a)     Heating: gas    Cooking: gas

          (b)     None.

          (c)     Single family home.

A.4.II.     Monroe Street, Williamsport, IN.

       Approximately 1962 to 1963.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
600 THIRD AVENUE
NEW YORK, N.Y. 10022

    (a)     Heating: gas    Cooking: gas

    (b)     None.

    (c)     Single family home.

A.4.III.    McDonald Street, Attica, IN.

Approximately 1963 to 1965.

    (a)     Heating: gas    Cooking: gas

    (b)     None.

    (c)     Duplex.

A.4.IV.    Old Rominy Road, Lafayette, IN.

Approximately 1966 to 1967.

    (a)     Heating: gas    Cooking: gas

    (b)     None.

    (c)     Single family home.

A.4.V.    2200 Shasta Drive, Lafayette, IN.

Approximately 1967 to 1974.

    (a)     Heating: gas    Cooking: gas

    (b)     Minor repairs; knocked down walls, installed shower.

    (c)     Single family home.

A.4.VI.    10 Blackfoot Court, Lafayette, IN.

Approximately 1974 to present.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

       (a)     Heating: gas   Cooking: gas

       (b)     None.

       (c)     Single family home.

5.     For every physician or other health care provider who ever tested, treated, consulted with or examined you up to and including the present date, for any reason whatsoever, please state the following separately as to each:

       (a)     name and address of physician or health care provider and, if ongoing, the approximate frequency of said treatment and services;

       (b)     date(s) of test, examination and/or treatment;

       (c)     symptoms complained of at the time, if any;

       (d)     any diagnosis made;

       (e)     treatment or examination given and reason for treatment or examination; and

       (f)     any drugs or medications prescribed.

A.5.    At the present time, although it is possible that plaintiff consulted other doctors, nurses and health care providers, plaintiff recalls the following names, dates and treatments:

A.5.I.    (a)     Dr. Daniel Nosek, Primary Care Physician.

                     401 Corbett St., Clearwater FL.  33756.

       (b)     Approximately December 2007 to present.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(c)     See medical records.

(d)     Mesothelioma; see medical records.

(e)     Followup care; see medical records.

(f)     See medical records.   .

A.5II.     (a)     Dr. Eli Freilich, Surgeon,

616 East Street, Clearwater, FL 33756.

(b)     Approximately March 2008.

(c)     See medical records.

(d)     See medical records.

(e)     See medical records.

(f)     See medical records.

A.5.III.     (a)     Dr. Crayton Pruitt, Surgeon.

643 Sixth Avenue South, St. Petersburg, FL 33701

(b)     Approximately 2007.

(c)     See medical records.

(d)     Mesothelioma; see medical records.

(e)     biopsy; see medical records.

(f)     See medical records.

A.5.IV.     (a)     Dr. Jose Alemar, Oncologist.

Gulfcoast Oncology Associates

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

1840 Mease Drive, Suite 309, Safety Harbor, FL 34695.

(b)    Approximately dates 2007.

(c)    See medical records.

(d)    Mesothelioma; see  medical records.

(e)    consultation; see medical records.

(f)    See medical records.

A.5.III.    (a)    Dr. Charmaine Lewis, Physician.

Morton Plant Hospital,

300 Pinellas Street, Clearwater, FL 33756.

(b)    Approximately November 2007.

(c)    Chest pain, shortness of breath, collapsed lung; See medical records.

(d)    Mesothelioma; see  medical records.

(e)    Emergency room care; see medical records.

6.    For every hospital, clinic or health care institution in which you have ever been admitted, treated, tested, or examined, whether as an "in-patient" or as an "out- patient," please state the following for each such visit:

(a)    name and address of the facility;

(b)    dates and description of test, treatment, examination or hospitalization and, if ongoing, the approximate frequency of said treatment and services; and

(c)    reason for visit to the facility.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

A.6.    At the present time, although it is possible that plaintiff may have been treated or examined in other hospitals and health institutions, plaintiff recalls the following:

A.6.I.    (a)    Morton Plant Hospital

300 Pinellas Street, Clearwater, FL 33756.

(b)    Approximately November 2007.

(c)    See medical records.

7.    State each of your asbestos-related injuries and/or diseases, describe the nature of those symptoms that you contend are related to your asbestos-related condition(s), and state the date when you first experienced each such symptom and the date of diagnosis and the name of any diagnosing physician and, if different, indicate the date you first became aware of the diagnosis.

A.7.    Plaintiff has sustained a number of asbestos-related injuries, including, but not limited to mesothelioma, pain and suffering, mental and emotional distress, shortness of breath, coughing, skin discoloration, weight loss, nausea, loss of appetite, difficulty breathing, abdominal swelling, severe chest pain, fatigue, respiratory discomfort and pain, sputum production and related sequelae. As indicated in plaintiff's medical records, at various and numerous times, plaintiff has experienced a variety of different and differing symptoms related to his injuries, which are numerous and frequent. At this time, plaintiff is unable to state the precise date of the various symptoms might have first occurred. See medical records for date of diagnosis

00115458.WPD                    11

and name of diagnosing physician.

8.    Describe any pain, incapacity, inability to lead a normal life, inability to work, or disability (including retirement) alleged to have resulted from your medical conditions, including the date and basis therefore.

A.8.    Plaintiff has experienced shortness of breath, coughing, weight loss, loss of appetite, severe chest pain, respiratory discomfort and pain, difficulty breathing, and fatigue, among other things.  Plaintiff's asbestos-related condition has totally disrupted his life, totally limited him in his everyday activities, interfered with his living a normal life, caused him fear, emotional distress, pain, suffering, discomfort, and inconvenience.  His ability to do any tasks that require any physical exertion such as gardening, climbing stairs, lifting, exercising and everyday chores around the house has been extensively diminished.

9.    Have you ever had any biopsies or tissue samples taken?  If so, please state for each such procedure:

(a)    the name of the physician performing such procedure;

(b)    the address where such procedure was performed;

(c)    the date when such procedure was performed; and

(d)    the results, conclusions, and/or diagnosis arising from such procedure.

A.9.I.    (a)    Dr. Crayton Pruitt, Surgeon

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

  (b)  Morton Plant Hospital, 300 Pinellas Street, Clearwater, FL 33756.

  (c)  November 2007.

  (d)  Mesothelioma; see medical records.

10. Have you ever had any chest x-rays, CT Scans and/or pulmonary function tests? If so, state:

  (a)  the dates and places;

  (b)  the reasons;

  (c)  the results and/or diagnosis resulting therefrom;

  (d)  the location of all chest X-ray films and CT Scans; and

  (e)  provide appropriate authorization to obtain all X-rays, CT Scans and pulmonary function tests.

A.10.I. (a)  Plaintiff has had x-rays taken at Morton Plant, but medical records may or may not reflect others.

  (b)  See medical records.

  (c)  See medical records.

  (d)  Chest x-ray films and CT Scans should be in the possession of the respective doctors and hospitals.

  (e)  Authorizations have been provided to RecordTrak.

11. Have you ever been exposed to, used, inhaled or ingested any of the following substances on a regular basis or at work. If so, state the date(s), place(s), and circumstances

00115458.WPD       13

thereof.

    (a)     acids

    (b)     aluminum

    (c)     arsenic

    (d)     barium

    (e)     beryllium

    (f)     butanol

    (g)     cadmium

    (h)     carborundum

    (i)     chloroethylene

    (j)     chlorine

    (k)     chromate

    (l)     chromite

    (m)     chromium

    (n)     coal dust (coal)

    (o)     coal tar

    (p)     cotton dust

    (q)     epoxy

    (r)     ethanol

    (s)     grinding dust

    (t)     iron

    (u)     isocyanates

00115458.WPD

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
600 THIRD AVENUE
NEW YORK, N.Y. 10022

 (v)  isopropanol

 (w)  lead

 (x)  live chickens

 (y)  manganese

 (z)  nickel

 (aa)  nitrogen dioxide

 (ab)  nuclear radiation

 (ac)  ozone

 (ad)  petroleum distillates

 (ae)  phosgene

 (af)  radiation

 (ag)  silica

 (ah)  titanium

 (ai)  toluene

 (aj)  welding smoke or fumes

 (ak)  zylene

 (al)  zinc.

A.11. Plaintiff was exposed to welding fumes while employed at Harrison Steel

Castings.  Plaintiff does not recall being exposed to any of the other above substances.

12. Do you use or have you ever used cigarettes, cigars, pipes, smokeless tobacco, or

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

any other tobacco substance, from birth to the present time?  If so, state the following:

      (a)     the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco);

      (b)     the dates during which you used each such product;

      (c)     the amount of the product used per day, during each period of time (e.g., 2 packs of cigarettes per day);

      (d)     whether you have ever been told by a physician that you are or were suffering from any disease or illness caused by or contributed to by tobacco; and

      (e)     whether you were ever advised by any physician or any other person that use of tobacco products could adversely affect your health and whether you were ever advised to stop using tobacco products, and if so, identify each physician or person who gave you any such advice, the dates on which the advice was given, and state exactly what, if anything, you did in response to that advice.

A.12.I.     Yes.

      (a)     Marlboro, filtered.

      (b)     Approximately 1957 - 1960.

      (c)     ½ pack per day.

      (d-e)    Plaintiff has tried to quit smoking numerous times. Further information to be provided.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

A.12.II.    (a)    Winston, filtered.

(b)    Approximately 1960 - 1970.

(c)    One pack per day.

(d-e)    Plaintiff has tried to quit smoking numerous times. Further information to be provided.


A.12.III.    (a)    Winston, filtered.

(b)    Approximately 1970 - 1985.

(c)    One to 1½ packs per day.

(d-e)    Plaintiff has tried to quit smoking numerous times. Further information to be provided.


A.12.IV.    (a)    Kent Golden Lights, filtered.

(b)    Approximately 1986 - 2007.

(c)    Two to three packs per day.

(d-e)    Plaintiff has tried to quit smoking numerous times. Further information to be provided.


A.12.V.    (a)    Marlboro Lights, filtered.

(b)    Approximately 2008.

(c)    Half a pack or less per day.

(d-e)    Plaintiff has tried to quit smoking numerous times. Further information to

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

be provided.

Further responding, plaintiff's practice has also been to smoke the end portion of each cigarette ( less than one half of each cigarette).

13.     For each spouse and member of your household, from your birth to the present time, state whether they use or have ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, and if so, state the following:

>    (a)    the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco); and

>    (b)    the dates during which they used each such product.

A.13.I.    Yes, Shirley Crowder, wife.

>    (a)    Winston, filtered.

>    (b)    1958 - 1985.

A.13.II.    (a)    Kent Golden Lights, filtered.

>    (b)    1985 - 2005 and 2006 - 2007.

A.13.I.    (a)    Marlboro Lights, filtered.

>    (b)    2008.

14.     Do you presently consume or have you in the past consumed alcoholic beverages. If so, state the following:

>    (a)    the type of alcoholic beverages consumed;

>    (b)    the dates during which you consumed each such alcoholic beverage;

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

    (c)     the amount of such beverage you consumed each day; and

    (d)     whether you have ever been treated for any illness or disease related to your consumption of alcoholic beverages.

A.14.  Plaintiff in the past drank beer.

15.    Have you ever been a member of the Armed Forces of the United States? If so, state the following:

    (a)     the branch of the service, serial number, and highest rank held;

    (b)     the beginning and ending dates of your military service;

    (c)     the type of discharge that you received; and

    (d)     whether you sustained any injuries or incurred any illness during military service.

    (e)     if you received a medical discharge, attach a copy hereto and set forth the medical reasons.

A. 15.I.  Yes.

    (a)     United States Navy; Service #5308092; Fireman/Boiler Tender.

    (b)     1958 - 1962.

    (c)     Honorable.

    (d)     No.

    (e)     No.

16.    As to each and every employer (including military service) you have had from the

00115458.WPD                19

ime you were first employed to the present, set forth the following:

(Use attached Chart A)

Include on the Chart all employers where you have worked, and all job sites, regardless of whether or not you believe you were exposed to asbestos during the employment. Also, include the source of any product identification information provided on Chart A.

A. 16.   See Chart A.

17.      Please state the following with respect to each asbestos-containing product identified on Chart A:

(a)      the color, dimensions, shape, form, texture, weight, appearance and flexibility of each product;

(b)      the appearance of the package or container indicating the manner of packaging, size, dimensions, color and weight; and

(c)      the name, logo, label, numerical and alphabetical markings and other markings or words including warnings on the product and package or container.

A. 17.   (a)      The asbestos-containing products identified in Chart A were varied in color, dimension, shape, form, texture, weight, appearance and/or flexibility. Further information may be provided in response to questioning at deposition.

(b)      To the extent that the asbestos-containing products identified in Chart A came packaged, such packaging varied in appearance, size, dimension, color and/or weight. Further information may be provided in response to questioning at

00115458.WPD                                              20

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

deposition.

(c)     To the extent that the asbestos-containing products identified in Chart A came packaged, such packaging may have contained various markings including the manufacturer or trade name of the product. In addition, the product itself may have also contained various markings. Plaintiff never personally observed any warnings about asbestos on product packaging or on the asbestos-containing products themselves.  Further information may be provided in response to questioning at deposition.

18.     If you have retired from your employment, set forth the following:

(a)     whether said retirement was voluntary or involuntary;

(b)     the effective date of said retirement;

(c)     the name of your employer at the time of retirement;

(d)     the reason for your retirement;

(e)     whether your retirement was related to any claimed asbestos-related injury; and

(f)     the amount of pension and/or retirement benefits you are receiving or entitled to receive.

A.18.I. (a)     Plaintiff stopped working at General Foods on or about the time the plant closed.

(b)     Date to be provided.

LEVY PHILLIPS &
KONIGSBERG. L.L.P.
600 THIRD AVENUE
NEW YORK, N.Y. 10022

    (c)     See above.

    (d)     See above.

    (e)     No.

    (f)     To be provided, if any.

19.    State whether you were exposed (either directly, through a co-worker or otherwise), to any Bankrupt Entity's asbestos-containing materials, or products either mined or manufactured, sold, or distributed by a Bankrupt Entity. If so, state the following:

    (a)     As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following, concerning Bankrupt Entities' products only:

        i.     Name of Employer;

        ii.     Dates of employment;

        iii.     Asbestos-related job site and address where Bankrupt Entity's products were being used;

        iv.     Dates you were at the job site;

        v.     Job duties at the particular job site;

        vi.     Bankrupt Entity's asbestos-containing materials or products to which you were exposed.

        vii.     Other companies using Bankrupt Entity's asbestos-containing materials or products at the jobsite; and

        viii.     Whether you received any warnings with respect to the use of said

00115458.WPD

22

product and the nature of those warnings.

    (b)     If you were exposed to, used, ingested or inhaled any Bankrupt Entity's

Asbestos-Containing Products at any time other than in the scope of your

employment, state for each such exposure:

        i.     the date, location and circumstances; and

        ii.     the type of product and the name of the manufacturer, distributor,

and miner.

A.19.   Subject to the foregoing general objection, plaintiff responds as follows:

       See plaintiff's attached "Chart A"

20.    If you were exposed to, used, ingested or inhaled asbestos or asbestos-containing

products at any time other than in the scope of your employment, state for each such exposure:

    (a)     the date, location and circumstances; and

    (b)     the type of product and the name of the manufacturer, distributor, and

miner.

A.20.   Plaintiff does not recall being exposed to asbestos-containing products outside the

scope of his employment at this time.

21.    Have you ever been a member of any labor union? If so, state:

    (a)     the name and address of each local, national and international labor union;

    (b)     the inclusive dates of your membership; and

    (c)     any positions you have held with each such labor union, and the dates

00115458.WPD

LEVY PHILLIPS &
KONIGSBERG. L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y 10022

during which you held such positions.

A.21.I. Yes, plaintiff was a member of a union while employed at General Foods. (see Chart A).

22.    State whether you have ever seen or received any information, instruction, direction, warning, or directive, from any source whatsoever, concerning alleged dangers of exposure to asbestos or asbestos-containing products, and if so, identify:

      (a)    each such warning, directive, notification, direction, instruction, or information;

      (b)    the means by which such was given to you;

      (c)    the source and the date on which it was received by you; and

      (d)    your response or reaction, including any complaints made or changes in work habits.

A.22.    No.

23.    State whether you had available for use during any period of your employment, respirators or masks or other dust inhalation inhibitor, or protective gear and, if so, state the following:

      (a)    the period of time during which said items were available;

      (b)    what instructions were given with regard to the use of each of said items;

      (c)    whether you used said items and the dates of your use;

      (d)    whether you ever requested said items, and, if so, when, where and to whom the request was made, and the response to the request.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

A.23.  Yes, plaintiff was a member of a union while employed at General Foods *(see Chart A)*.

24.  If you are making a claim for loss of earnings or impairment of earning power because of your medical conditions, state the following:

    (a)    date of commencement of any loss or impairment;

    (b)    the name and address of your employer, your job title and your monthly or weekly rate of pay at the time of the alleged commencement of any loss or impairment;

    (c)    if you had more than one employer during the three year period prior to the date of the commencement of any loss or impairment, as indicated on Chart A, provide your monthly or weekly rate of pay and inclusive dates of such employment during the three year period;

    (d)    your total earnings for the period of three years prior to the commencement of any loss or impairment;

    (e)    the inclusive dates during which you allege that you were unable to work as a result of any loss or impairment and the total amount of pay you claim you lost because of this absence;

    (f)    the date on which any loss or impairment ended; and

    (g)    your monthly or weekly rate of pay which you have received, from the date of any loss or impairment ended through the present time.

A.24.  Plaintiff does not assert a claim for loss earnings.

00115458.WPD

25

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y 10022

25.    Do you claim damages for loss of consortium, society, affection, services, or sexual enjoyment? If so, please set forth in complete detail all facts on which this claim is based, including a complete description of the loss suffered.

A.25.  Plaintiff's spouse, Shirley Crowder, does assert a claim for loss of consortium, society, affection, services, and sexual enjoyment. This claim is based upon the deleterious effect of asbestos exposure on the health and well being of James Crowder and its effect on his ability to provide companionship, love, affection, and services to his wife.

26.    For each person who is or was partially or totally dependent upon you for financial support and assistance during the last ten years, state:

        (a)    the name, address, sex, age and relationship; and

        (b)    the amounts you contributed during the last ten years for support and assistance.

A.26.  (a) Shirley Crowder; 10 Blackfoot Court, Lafayette, IN 47909; female; spouse;

        (b)    Total support.

27.    State, in the form of an itemized list, all special damages alleged in this lawsuit including, but not limited to, hospital charges, medical charges, medicines, lost wages, etc., naming the person or organization to whom each item of expense was paid or is due, and, if paid, by whom each item of expense was paid.

A.27.  Expenses are ongoing; to be provided.

00115458.WPD                                26

28.  Identify and give the substance of all written statements, recordings, or videotapes which relate to the facts of this lawsuit and the damages you claim given by plaintiff or any witness (provided such information is in plaintiff's possession, custody or control and/or such statements, recordings or videotapes are not protected by the attorney-client privilege) in the above-captioned matter.

A. 28.  None.

29.  Have you ever made any claim for, or received any, health or accident insurance benefits, social security benefits, state or federal benefits for disabilities, workers' compensation benefits, veterans' benefits, tort claims or suits, Federal Employers Liability Act claims or suits, Longshoremen and Harbor Workers Act claims or suits, unemployment compensation insurance benefits, or early payment from any public or private pensions due to disability or your medical condition?  If so, state the following:

    (a)  the date and place where each such claim was made;

    (b)  the name and nature of the entity with which the claim was made;

    (c)  any identifying number, such as a docket or petition number, for each claim;

    (d)  the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

    (e)  the nature of the claim;

    (f)  whether you were examined by a physician and if so, the name and address of that physician;

00115458.WPD                                27

(g)    the result of such claim, including the amount realized by way of settlement, judgment or award upon the claim;

(h)    the name and address of any attorney who represented you with regard to such claims; and

(I)    whether you are presently receiving such benefits.

A.29.  Plaintiff has received disability benefits since approximately the early 1990's due to depression after the death of plaintiff's youngest son, Mark.

30.    State the following with regard to your asbestos-related legal action:

(a)    Did you file an asbestos-related claim in more than one (1) jurisdiction;

(b)    Identify all of the jurisdiction(s) where an asbestos-related claim has been filed (whether or not these claims have been dismissed or discontinued or otherwise resolved) on your behalf;

(c)    Did you file your asbestos-related claim(s) under more than one (!) Index Number; and

(d)    Provide all of the Index Numbers for all of your asbestos-related claim(s), including all multiple Index Numbers for Claims filed in New York County.

A.30.  Subject to the foregoing general objection, plaintiff responds as follows:

(a)    No.

(b)    New York County.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(c)    No.

(d)    Index No.: 08/105768

31.    State whether or not you have made, filed, or submitted a Claim Against Bankrupt Entity

or received funds in settled from a Bankrupt Entity. If so, for each claim state the

following:

(a)    the date and place where each such claim was made;

(b)    the name and nature of the entity with which the claim was made;

(c)    any identifying number, such as a docket or petition number, for each

claim;

(d)    the defendant, agency, insurer, employer or other entity to or against whom

the claim was made and its file number;

(e)    the nature of the claim;

(f)    whether you were examined by a physician and if so, the name and address

of that physician; and

(g)    whether you received any compensation as a result of such claim, but not

the amount.

A.31.    Subject to the foregoing general objection, plaintiff responds as follows:

No.

32.    State whether you have applied to any Bankrupt Entity or Bankruptcy Court to lift

the stay as to your claim or otherwise have attempted to join a Bankrupt Entity to

00115458.WPD                    29

this action.

A.32    Subject to the foregoing general objection, plaintiff responds as follows:

As of the present time, plaintiff has neither applied to any Bankrupt Entity or

Bankruptcy Court to lift the stay nor otherwise attempted to join a Bankrupt Entity to this

action because any such action would be contrary to federal law which provides that

plaintiff is barred from proceeding against any Bankrupt Entities in this action. Further,

any such action would force the Bankrupt Estate or Settlement Trust to unnecessarily

incur litigation costs, thereby causing an unnecessary drain on trust assets that are

designed to benefit asbestos victims.

33.     Have you or your spouse ever been a party to or a witness in any lawsuit, court or

administrative proceeding?  If so, please state:

>    (a)    whether you or your spouse were a party or witness and if party, whether
>
>           plaintiff or defendant;
>
>    (b)    the precise name of the lawsuit or proceeding, the court agency in which it
>
>           was brought and the docket number;
>
>    (c)    the nature of the charges or claims and, if you or your spouse were a
>
>           witness, the subject matter of the testimony; and
>
>    (d)    the disposition of the case.

A.33.   Yes.

00115458.WPD                                    30

     (a)    Spouse was a party; plaintiff.

     (b)    Lafayette, Indiana.

     (c)    Personal injury, broken wrist. Slip and fall case against Kohl's.

     (d)    Settled.

34.    Have you or your spouse filed a claim seeking compensation for any alleged asbestos-related condition from any entity, including settlement trusts? Specify "Yes" or "No" only.

A.34.  Other than the present lawsuit, no.

35.    Identify all entities, whether or not parties to this lawsuit, with whom you have settled or agreed to settle this lawsuit.

A. 35.  Settlements are ongoing. A list will be provided of all defendants not dismissed by Summary Judgement or otherwise immediately prior to trial.

36    Identify all persons, other than your attorneys, who provided you with any information used in answering these interrogatories, and state the particular information each person supplied.

A.36.  Myself.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to paragraph 19 of the CMO, the defendants request that plaintiffs produce for inspection and copying, the documents and things identified below. The documents and things identified herein shall be produced for inspection and copying at such time as the answers to the interrogatories herein are filed.

You are hereby requested to produce the following documents and things:

1.    All documents identified in your answers to these interrogatories.

R.1.    Such documents will be produced, to the extent required by the relevant rules.

2.    All documents relating to the plaintiff's job qualifications and professional licenses held.

R.2.    If any such documents are located in plaintiff's possession, they will be produced.

3.    All documents relating to the plaintiff's membership in any labor trade association or professional organization.

R.3.    Not applicable.

4.    All documents relating to the plaintiff's military or foreign service, including and not limited to, personnel records, discharge papers, military occupational specialty qualifications, promotions, reductions or disciplinary actions.

R.4.    Authorizations have been provided to Recordtrak, 651 Allendale Road, King of Prussia, PA 19406. Plaintiff will produce photographs from the Navy, as well as records concerning his Navy service that plaintiff has in his possession.

5.    All documents relating to any claim or demand ever made by the plaintiff for damages, compensation or other benefits allegedly resulting from any illness or

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

injury, including but not limited to, Industrial Accident Board records, social

security disability claim records, federal or state employment compensation claim

records, social disability records, pension claim record or any other health or

accident insurance claim records.

R.5.    Not applicable.

6.    All documents in plaintiff's possession, custody or control relating in any way to

the plaintiff's exposure or possible exposure to asbestos, asbestos-containing

products and/or asbestos-containing materials.

R.6.    See Answer No. 4., at this time plaintiff has no additional response document in

his personal possession.

7.    All documents in plaintiff's possession, custody or control relating in any way to

the plaintiff's exposure or possible exposure to silica, acids, beryllium, nuclear

radiation, ammonia, cadmium, chlorine, chromate, phosgene, grinding dust, coal

dust, cotton dust, nickel, welding smoke or fumes.

R.7.    At this time, plaintiff has no such documents in his personal possession.

8.    All documents, of which you have ever become aware, relating in any way to

warnings, potential health hazards, instructions or precautions regarding the use or

handling of, or exposure to, asbestos, asbestos-containing products, and/or

asbestos-containing materials.

R.8.    At this time, plaintiff has no such documents in his personal possession.

9.    All applications prepared or submitted by or on behalf of the plaintiff for life

insurance, medical insurance, health and accident insurance, and/or disability

00115458.WPD                         33

insurance.

R.9.   At this time, plaintiff has no such documents in his personal possession that

specifically relates to his mesothelioma.  Plaintiff objects on the grounds that

such request seeks information that is overbroad and not material or necessary to

this litigation.

10.    All statements, recorded interviews, films, videotapes, reports, questionnaires,

forms or other documents made, submitted, compiled, prepared or filled out by,

on behalf of, or under the direction of, plaintiff relating in any way to exposure or

alleged exposure to asbestos, asbestos-containing products and/or

asbestos-containing materials or any other issues relating to this lawsuit except

that information prepared by, for, or at the request of plaintiff's counsel must be

identified (including the date made), but need not be produced without an order by

the Court, provided that written or recorded communication between plaintiff and

counsel, made after an attorney-client relationship has been established, and

attorney work product, need not be produced or identified.

R.10.  Objection.  Attorney/client privilege; work product privilege.

11.    All records in plaintiff's possession, custody or control relating to comments,

complaints, suggestions, or proposals made to your employer or your union, by

yourself or by other employees or union members regarding asbestos exposure.

R.11.  At this time, plaintiff has no such documents in his personal possession.

12.    All written, recorded, filmed, transcribed or videotaped statements of all parties

and non-party declarants pertaining to the subject of this lawsuit, except that

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

information prepared by, for, or at the request of plaintiff's counsel must be

identified (including the date made), but need not be produced without an order by

the Court, provided that written or recorded communication between plaintiff and

counsel made after an attorney-client relationship has been established and

attorney work product need not be produced or identified.

R.12.   Objection. Attorney/client privilege; work product privilege.

13.     All photographs of the plaintiff at work or in work clothes and all photographs of

all products or conditions complained of in the plaintiff's place of employment.

R.13.   See Answer No. 4.

14.     Copies of all itemized bills covering all the special damages and losses and

expenses claimed in this matter.

R.14.   See A.27. Bills to be provided if located.

15.     Copies of all reports, correspondence and records from any doctor who has

examined the plaintiff, any hospital where the plaintiff has been treated either as

an inpatient or as an outpatient, except for any reports, records, correspondence, or

communications issued by any consulting physicians who have been retained or

specially employed in anticipation of litigation or preparation for trial and who are

not expected to be called as a witness at trial.

R.15.   Medical authorizations have been provided to RecordTrak, 651 Allendale Road,

King of Prussia, PA 19406. As a courtesy, plaintiff will provide medial records

relating to his mesothelioma that are in his possession.

16.     All tissue specimens, tissue slides, and x-ray films and CT scans pertaining to the

00115458.WPD                                35

plaintiff.

R.16.    Medical authorizations have been provided to RecordTrak, 651 Allendale Road,

King of Prussia, PA 19406. As a courtesy, plaintiff will provide medial records

relating to his mesothelioma that are in his possession.

17.    Copies of plaintiff's income tax returns for the last ten years of plaintiff's

employment and up to the current year as well as any other documents, including

economic loss reports, upon which plaintiff relies in support of his claims.  If loss

of earnings or earning capacity is alleged or claimed to have occurred before the

current year, include copies of the income tax returns of the plaintiff from ten

years prior to the claimed loss and up to the current tax year.

R.17.    Authorizations have been provided to RecordTrak, 651 Allendale Road,

King of Prussia, PA 19406.

18.    Any asbestos and/or asbestos-containing products or product packaging of the

type to which the plaintiff alleges exposure and which the plaintiff has in his

possession, custody or control.

R.18.    At this time, plaintiff has no such products in his personal possession.

19.    All photographs, charts, drawing, diagrams or other graphic representations

depicting work conditions at work sites where the plaintiff claims the plaintiff was

exposed  to asbestos or asbestos-containing products.

R.19.    See Answer No. 4.

20.    All invoices, bills, statements and any other writings or records which the plaintiff

contends evidence the sale of any products containing asbestos to the place of the

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

plaintiff's employment at which plaintiff claims that plaintiff was exposed to asbestos. This does not include documents in the possession, custody or control of plaintiff's attorney unless such documents were provided by plaintiff to his/her attorney and are not privileged.

R.20.  At this time, plaintiff has no such documents in his personal possession.

21.  Any written advice, publication, warning, order, directive, requirement, or recommendation, which advised or warned of the possible harmful effects of exposure to or inhalation of asbestos or asbestos-containing products in the products in the possession, custody or control of the plaintiff.

R.21.  Objection. Work product, over-broad, unduly burdensome and irrelevant. Subject to this objection, appropriate exhibit and witness lists will be provided at the appropriate time.

22.  Any accident or incident reports which relate to the facts, circumstances or incidents which form the basis of plaintiff's complaint.

R.22.  At this time, plaintiff has no such documents in his personal possession.

Dated:     New York, New York
           April 25, 2008

LEVY PHILLIPS & KONIGSBERG, LLP

Jerome H. Block, Esq.
*Attorneys for Plaintiff*
800 Third Avenue, 13th Floor
New York, NY 10022
(212) 605-6200

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

00115458.WPD

38

0011544G.WPD

## CHART A
## JOBSITE-SPECIFIC EXPOSURE HISTORY    Re: James Crowder

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM¹ Used Personally | Other ACM to Which You Were Exposed² | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| U.S. Navy | 1958 - 1962 | USS FDR Brooklyn Navy Yard (1961-1962) | 1958 - 1962 | Apprentice Fireman<br><br>Fireman<br><br>Boiler Tender 3ʳᵈ Class (BT3)<br><br>Boiler Tender 2ⁿᵈ Class (BT2) | Plaintiff presently recalls that he exposed to various types of asbestos-containing materials and equipment including asbestos-containing gaskets, packing, boilers, draft blowers, compressors, turbines, generators, pumps, valves, steam traps and like materials and equipment.<br><br>Plaintiff may further rely upon the testimony of co-workers if available and other evidence, including Naval records, demonstrating the presence of various manufacturers' products. Other evidence may provide identification of asbestos-containing materials and equipment and the manufacturers of such products. | Plaintiff presently recalls that he was exposed to various types of asbestos-containing materials and equipment used in his vicinity including asbestos-containing gaskets, packing, boilers, draft blowers, compressors, turbines, generators, pumps, valves, steam traps and like materials and equipment.<br><br>Plaintiff may further rely upon the testimony of co-workers if available and other evidence, including Naval records, demonstrating the presence of various manufacturers' products. Other evidence may provide identification of asbestos-containing materials and equipment and the manufacturers of such products. | | | |
| Radio Materials/ Mallory, Attica IN | Summer 1962 | Radio Materials/ Mallory, Attica IN | Summer 1962 | Tank Operator | No known asbestos exposure | No known Asbestos Exposure | | | |
| Harrison Steel, Attica, IN | 1963 - 1966 | Harrison Steel, Attica, IN | 1963 - 1964 | Welder | No known asbestos exposure | No known asbestos exposure | | | |

**CHART A**

**JOBSITE-SPECIFIC EXPOSURE HISTORY     Re: James Crowder**

| Name of Employer | Dates of Employ-ment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite Including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| Fairfield Manufacturing Lafayette, IN | 1967 - 1968 | Fairfield Manufacturing Lafayette, IN | 1967 - 1968 | Natco Drilling | No known asbestos exposure | No known asbestos exposure | | | |
| Universal Motors, Sagamore Pkwy., Lafayette, IN | 1968 - 1970 | Universal Motors, Sagamore Pkwy., Lafayette, IN | 1968 - 1970 | Auto Mechanic | Plaintiff presently recalls that he handled and/or worked with asbestos-containing automotive parts including asbestos containing brakes and clutches.<br><br>Plaintiff may further rely upon the testimony of co-workers if available and other evidence. | Plaintiff recalls working with and around other people using various asbestos-containing automotive parts including asbestos containing brakes and clutches.<br><br>Plaintiff may further rely upon the testimony of co-workers if available and other evidence. | | | |
| | | | | Desk Clerk | Plaintiff presently recalls handling and/or working with the following including among others:<br><br>**Brakes and Clutches**<br>**Volkswagen** | Plaintiff presently recalls the following materials being used in his vicinity including among others:<br><br>**Brakes and Clutches**<br>**Volkswagen** | | | |
| General Foods Lafayette, IN | 1971 - 1989 | General Foods Lafayette, IN | 1971 - 1989 | Mechanic | No known asbestos exposure | No known asbestos exposure | | | |

1.    ACM - Asbestos Containing Materials of Products.

2.    Identify brand and manufacturer names, if known.

0011S446.WPD



## AFFIDAVIT OF DAVID HOBSON

David Hobson states as follows:

1.     I adopt and incorporate by reference for purposes of this case the statements contained in the affidavit that I executed on October 17, 2003.

2.     By virtue of the knowledge I have obtained over the course of my career concerning the historical practices of GE and the U. S. Navy with regard to the marine steam turbines, I can state that the practices described in my October 17, 2003 affidavit concerning the U. S. Navy's control and direction related to marine steam turbines would have been applicable at least as far back in time as World War II.

3.     The Navy is a military organization that operates according to a specific chain of command. As part of that organizational structure, the Navy established specific lines of communication that GE and its employees were required to follow in dealings with the Navy and Navy personnel in connection with equipment that GE supplied or serviced for the Navy. GE and its employees did not have authority to give orders or direction to Navy personnel. The working relationship between the U.S. Navy and GE with respect to naval turbines is described in greater detail in my October 17, 2003 affidavit.

4.     Because of the nature of its mission, the Navy exercises 100% ironclad control over what goes on its ships. In this regard, the Navy had precise specifications as to the nature of any information that was to be affixed to equipment supplied to the Navy by GE. Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been

permitted to affix any type of warning or caution statement to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy.

5.      The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines, such as engineering drawings and other technical data that could be used as needed by shipboard engineering officers during the life of the equipment. Normally these materials were compiled into a volume that was generically called a "technical manual." The Navy required that every piece of equipment such as a naval turbine be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. This participation included extensive review and editing of drafts of the technical manuals by Navy personnel. The technical manuals were finalized and printed in final form only after the Navy had given its approval and signed off on them. These manuals included safety or hazard information only to the extent directed by the Navy.

6.      During my career, I have observed many pieces of naval equipment both prior to and after installation on ships. Depending upon the time frame, some of these pieces of equipment have had certain safety or caution notices or other data stamped on plates that were attached to them. The content and format of this information is established by the Navy, not by the equipment manufacturers, and concerned matters related to the equipment itself, such as maximum operating pressure, temperature and back pressure. The Navy, not GE, determined the nature of hazards to be subject to any precautionary labeling and the content of the labeling in question. Both under the Navy's specifications and the

Navy's actual practices, it was the Navy, not GE, that determined the nature of any warnings to be affixed to shipboard equipment and materials.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___6 TH___ day of October, 2004

David Hobson
DAVID HOBSON

3

## AFFIDAVIT OF DAVID HOBSON

1.      I joined General Electric Company ("GE") in 1969 and was employed there until 1996, when I retired.  My last position with GE was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine business in Fitchburg, Massachusetts.  Since that time I have been involved in several business ventures related to marine steam turbines and the Navy's use thereof.  Before joining GE, I received a degree in Marine Engineering from the Massachusetts Maritime Academy and was licensed for many years as a second assistant engineer by the United States Coast Guard.  I sailed as an engineering officer on steam ships and worked as an engineer in the shipbuilding industry before my employment with GE.  I was involved in marine engineering during my career at GE.  I have personal knowledge of the facts contained herein.

2.      I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by GE of equipment intended for installation on U.S. Navy vessels, particularly marine steam turbines.

3.      During my 27 years of employment with GE, I had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and use of marine steam turbines from GE.  Over the same time period, I also had extensive business dealings on behalf of GE with commercial shipyards and/or ship owners in connection with their purchase and use of marine steam turbines from GE.  GE sold its marine steam turbines to the Navy and commercial shipyards and/or ship owners for installation aboard ships.

4.    I have studied military and commercial specifications and other documents dating back to World War II concerning marine steam turbines and have conferred on numerous occasions with Naval officers and others involved in Naval and commercial shipbuilding. I have made frequent trips to Naval and commercial shipyards and have been aboard numerous Naval and commercial vessels in all stages of construction, testing and operation.

5.    I am personally familiar with the extent of U.S. Navy control over the production of turbines built for U.S. Navy vessels by GE because I participated in the design, manufacturing, testing and sea trials of these turbines and personally interacted with the Navy's machinery inspectors. Based on my education, training and experience, I have thorough knowledge of the historical practices of GE with regard to marine steam turbines that were purchased from GE by the Navy and commercial shipyards and/or ship owners for installation aboard ships.

6.    GE manufactured and supplied turbines for U.S. Navy ships under contract between GE and the shipyards and/or United States of America, specifically the Navy Department. That department administered the contract through Navy Sea Systems Command ("NAVSEA"), the Department of the Navy in Washington, D.C., which acted under authority of the Secretary of the Navy. NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all ship equipment. NAVSEA officers supervised, enforced and approved the supplier's compliance with the plans and specifications, which could only be authorized by the Navy through one of its officers.

7.    The INM, a Naval officer subordinate to various levels of command within NAVSEA, supervised GE's production of turbines for Navy vessels. The INM, who worked on-

2

site at GE's Fitchburg and Lynn plants in Massachusetts, exercised direct control over all aspects of GE's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications. All aspects of the design, performance requirements and materials used for construction, including thermal insulation for Navy vessels, were specified by NAVSEA. As manufactured and shipped to the Navy by GE, turbines did not have any thermal insulation materials (whether containing asbestos or otherwise) anywhere on them. GE did not make, sell, or install marine steam turbines with asbestos-containing thermal insulation. Any thermal insulation materials, including thermal insulation blankets, that may have been applied to GE's turbines after they left GE's manufacturing facility would have been supplied and installed by entities other than GE.

8.      GE, during all aspects of its turbine work related to U.S. Navy vessels, performed its work under the immediate supervision of the Navy through NAVSEA officers. Supervision and control were exercised through contract documents, design construction drawings, written specifications and personal oversight of GE's work by ship engineers and machinery specialists employed by the U.S. Navy.

9.      The chain of U.S. Navy authority between GE and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility. Virtually no aspect of the development, manufacture and testing of Naval turbines escaped this close control. An extensive set of General Specifications for ships of the United States Navy as well as U.S. Navy specifications or military specifications known as Mil-Specs were already in place prior to construction of a U.S. Navy vessel. The Mil-Specs comprised tens of thousands of pages and

3

governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

10.    The U.S. Navy specifications for GE's marine steam turbines manufactured for the Navy incorporated several lower-level specifications for components or materials used for or with the turbines and governed detailed items like metals, bearings and gaskets. The turbines manufactured and supplied by GE for any U.S. Navy vessel had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question.

11.    In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built under direction and control of the Navy. NAVSEA developed the initial conceptual design for all classes of Naval vessels. In the design phase of a turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority. By the time an outside design consultant began to participate in the design phase of a new turbine, the U.S. Navy had specified at least the weight, size, power output, speed, and other design parameters.

12.    If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption. Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype supplier would begin tooling and constructing under continuing U.S. Navy supervision and oversight during manufacture of a turbine at sites such as the Lynn and Fitchburg plants.

13.    At each of these GE facilities, the INM was on site full time in a separate office called the Defense Contract Management Office. Frequently, GE engineers such as myself dealt

4

directly with the Navy's Turbine Section in Washington, D.C. A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lynn and Fitchburg facilities, for example, INM's staff typically included more than three or four full time civilian U.S. Navy inspectors and several mechanical engineers. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times. During the construction of the prototype turbine, all drawings, approvals and any reports of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

14. Many steps of the production process required in-process testing. For example, all welds were tested per the Navy design specification. All weld testing reports were reviewed and approved by the INM on site. The INM also approved of the procedures used to test the welds. Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports, which resulted in the replacement of a component part, were also sent to NAVSEA for its review.

15. Before shipment, the turbine typically was tested per contract specification at the site of manufacture. A detailed test agenda for on-site testing was approved by the U.S. Navy. The agenda included tests for power output or speed at various levels of steam pressure, vibration and noise test, bearing temperature test and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the

5

turbine, including all test reports. The final report was then submitted for approval to the on-site INM.

16.     Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required before the manufacturer could ship the turbine. Following the completion of the test agenda, the turbine was fully disassembled and inspected. This was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any contract design or manufacturing abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing. A report of each tear-down was prepared and was then approved and signed by the INM.

17.     Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. Once received, a quotation would then be subject to a similar review as that described above with respect to prototype unit, including quotation review meeting(s). Approval of a quotation would eventually be given to one or more vendors. Often two vendors were selected to supply production turbines. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

18.     The manufacturing process for the production unit then proceeded under the same level and intensity of U.S. Navy scrutiny and supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described

6

above, would oversee and approve virtually every aspect of manufacturing and testing the turbine. As before, a test agenda for the production unit was approved by the U.S. Navy and all reports from the tests were approved by the on-site INM. Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM. Any abnormalities were noted and resolved. A final report was prepared for each turbine, incorporating the test series reports, and was approved by the on-site INM and by the Department of the Navy in Washington, D.C. Re-assembly of each turbine was then approved by the U.S. Navy civilian inspectors prior to shipment.

19.     The first production unit was then shipped to the shipyard that had construction responsibilities for the first vessel (either a Navy shipyard or a civilian yard working under contract with the Navy). The turbine was typically installed by shipyard personnel acting under supervision of engineers from the Navy Supervisor of Shipbuilding, who was subordinate to the Commander of NAVSEA.

20.     Once the turbine was installed, it was typically tested by the shipyard at the dock at some load. This testing was reviewed and approved by U.S. Navy personnel at the shipyard. Any deficiencies discovered at this stage were required to be remedied by GE under Navy direction and supervision. Once the ship was launched and outfitted, sea trials followed. The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval. Representatives from the major component vendors would also attend. I have attended more than twelve builder's trials as GE's turbine representative on the builder's trials. Prior to GE, I had engine room installation, operation and testing responsibility for more than twelve Navy

7

ships while employed by a major shipyard. Following successful completion of the builder's trial, the U.S. Navy would conduct an additional sea trial, called an "acceptance trial." Acceptance trials were fully conducted and staffed by U.S. Navy officers, civilian employees and crew, with shipyard and manufacturer's representatives along to observe. As before, any deficiencies discovered with the turbine during acceptance trials would be corrected by GE under direction and control of the Navy. Following the acceptance trial, the vessel was commissioned and would typically embark on a "shake-down cruise." During this cruise, the operation of all components of the vessel were further evaluated and tested by Navy personnel under the widest possible range of operating conditions.

21.     During the launching, outfitting and sea trials of the first vessel of a new class, other vessels in the class may be under construction on a trailing schedule. Each and every vessel would go through essentially the same construction, inspection, testing, sea trials and shake-down procedure as described above for the first vessel of the class. All equipment, including the turbines supplied by GE, was built in accordance with U.S. Navy specifications in existence at the time and was approved by the U.S. Navy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2003.

DAVID HOBSON

8



### AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET.

1.    I am a retired Rear Admiral of the United States Navy. Before joining the Navy in 1942, I received a Bachelor of Science degree in Mechanical Engineering from the College of the City of New York. After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University. While in the United States Navy, I served as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 and 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1954. I was promoted to Rear Admiral in 1977 in the Naval Reserve.    I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975. I have personal knowledge of the facts contained herein.

2.    I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design and manufacture of equipment intended for installation on Navy vessels.

3.    During my tenure in the Navy and as Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard). Any deviation from military specifications of

NJ/130115v1

equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with the shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

4.      In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

5.      Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this __ day of October, 2004

Ben J. Lehman, Rear Admiral U.S. Navy, Ret.

Sworn and subscribed to before me
on this __ day of October, 2004

_____
Notary Public

L. McKAY
Notary Public - State of Nevada
Appointment Recorded in Douglas County
No: 99-36360-5 - Expires June 10, 2007